# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 7, 2011

## BENJAMIN ASHLEY RAY DICKENS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-D-3151   Seth Norman, Judge**

---

### No. M2011-00396-CCA-R3-PC

---

A Davidson County jury found the Petitioner, Benjamin Ashley Ray Dickens, guilty of first degree felony murder, and the trial court sentenced him to life imprisonment in the Tennessee Department of Correction.  The Petitioner appealed, and this Court affirmed the conviction in *State v. Benjamin Ashley Ray Dickens*, No. M2006-01697-CCA-R3-CD, 2007 WL 1988024, at *4 (Tenn. Crim. App., at Nashville, May 28, 2003), *perm. app. denied* (Tenn. Nov. 19, 2007).  The Petitioner filed a petition for post-conviction relief and filed two subsequent amended petitions.  After the post-conviction court held an evidentiary hearing, it dismissed the petition.  On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because he received the ineffective assistance of counsel at trial, and he further argues that the State made improper arguments during its closing argument, amounting to prosecutorial misconduct.  After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Benjamin Ashley Ray Dickens.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Assistant Attorney General; Victor S. Johnson, III, District Attorney General, D. Paul DeWitt and Dan Hamm, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

# A. Trial

This case arises from the Petitioner's participation in an attempted robbery during which Justine Green was shot and killed. Based on this conduct, a Davidson County grand jury indicted the Petitioner for first degree murder committed during the perpetration of or an attempt to perpetrate robbery. On direct appeal, this Court summarized the underlying facts of the case as follows:

> Mary Jane Crockett Green, Justin Green's mother, testified that at the time of Justin's murder she lived with him and her other son who was Justin's half-brother, Christopher Crockett, Christopher's girlfriend, Arenthia Burkeen, and their two children. They all lived in a one-level home, and Justin and Christopher had bedrooms located next to each other, both of which were in the front of the house.
>
> On the night of this murder, Green awoke when her dog barked viciously. She went to her bedroom door and saw Crockett standing with his hands in the air while the [Petitioner] pressed a gun into Crockett's chest. She startled the [Petitioner], and he turned and pointed the gun at her. Then, the [Petitioner] turned and pointed the gun at the dog who had begun to attack him. The [Petitioner] threatened to kill the dog, and Crockett told the [Petitioner] that he could take the dog somewhere else. Crockett led the dog down a hallway into a den. Green asked the [Petitioner] not to hurt anyone, and then she heard gunfire from the front of the house. She explained that she and the [Petitioner] could not see the area of the gunfire from where they were standing.
>
> Green testified that the gunfire appeared to frighten everyone, and she ran into her bedroom. She saw the [Petitioner] run toward the back door and Crockett run down the hallway. Green testified that there was "gunfire everywhere," and she went to her bathroom and then back to her bedroom door. There, she saw a different man run out the back door, followed by Crockett, who was carrying a gun. Shortly thereafter, Crockett came back inside the house and locked the door. Green entered Justin's room and saw that he was lying unconscious face down on his stomach. She attempted to perform C.P.R. on him while Burkeen called 9-1-1. The police arrived shortly thereafter. Green heard a policeman call for the homicide squad and knew that her son was dead.

2

Christopher Crockett testified that he and Justin had been playing video games in Justin's room when this crime occurred. The [Petitioner] entered the room, pointed a gun at Crockett, and asked Crockett to take him to "the money." Crockett began to take the [Petitioner] to where some money was located but stopped after Crockett's dog attacked the [Petitioner]. The [Petitioner] threatened to kill Crockett's dog but allowed Crockett to take his dog to a different room. Another intruder came into the house, ran toward Justin's bedroom, and then gunfire erupted from that area of the house. Crockett ran toward the front of the house, the [Petitioner] shot at Crockett, and the second intruder came running out of Justin's bedroom. Crockett fought with the second man and took his gun, which Crockett dropped on the ground because it did not work. Crockett retrieved his own gun from his room. The [Petitioner] and the other intruder, who were standing near the back door, shot at Crockett, and Crockett shot back. The [Petitioner] then got the other man out of the house, and both men ran out the back door. Crockett tried to chase these men, and they both shot at Crockett. On cross-examination, Crockett testified that the [Petitioner] shot at anyone who was in the second intruder's way. He acknowledged that the second intruder was injured, and the [Petitioner] assisted the second intruder in escaping from the house while Crockett was shooting at them.

Arenthia Nicole Burkeen testified that on the night of the crime the [Petitioner], who had a gun, came into her room and told her to give him her cell phone. Burkeen later heard gun shots. After the gun shots had ceased and she felt safe, she emerged from her room. Burkeen and Green went into Justin's room where they discovered that Justin had been injured, so Burkeen called 9-1-1.

Various police officers described their involvement with the investigation of this crime. Officer Carlos Anderson testified that he arrived at the crime scene and observed Justin Green who had been shot. Justin had short and raspy breath, and Officer Anderson performed C.P.R. He saw blood stains and bullet holes in the hallway area leading toward the back of the house. Detective Joe Williams testified that he attended the victim's autopsy and obtained the bullet retrieved from Justin's body. Sergeant Danny Orr testified that he found three different weapons at the crime scene. Officer Charles Lindville testified that he found shell casings outside the home where the crime occurred. Michael L. Pyburn testified that he examined guns and bullets that were retrieved from the crime scene.

Dr. Stacy Turner testified that she performed an autopsy on Justin's body. She said he died from a gunshot wound to the chest, and she removed the bullet from his body. A toxicology report was performed, and no drugs or alcohol were found in the victim's blood.

Based upon this evidence the [Petitioner] was convicted of first degree felony murder.

*Dickens*, 2007 WL 1988024, at *1-2.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, alleging the following grounds against Counsel for ineffective assistance of counsel: (1) failing to seek a negotiated settlement of the case with the State prior to trial; (2) only meeting with the Petitioner approximately three times prior to trial without discussing settlement of the case; (3) failing to present, at trial, "the agreed upon defense" that the Petitioner arrived at the location of the murder solely to purchase marijuana; (4) failing to present evidence of drugs and scales found at the scene to prove that the residents at the home sold drugs from that premises; (5) failing to impeach the testimony of Christopher Crockett; (6) failing to subpoena witnesses to testify "to facts of the case which were erroneously ignored by Counsel;" (7) failing to "assert to the jury" that the Petitioner did not wear a mask during the offense, as stated by Christopher Crockett in his trial testimony; (8) failing to present Christopher Crockett's criminal records at trial, in order to prove that he is "a known drug dealer with a lengthy criminal record of drug possession with intent to sell;" (9) failing to explain to the jury that the State's witnesses fabricated testimony during the trial regarding the Petitioner's "alleged weapon and firing of that weapon inside of the residence;" (10) failing to hire a private psychologist and a private psychiatrist to evaluate the Petitioner, in order to show that the Petitioner was, at the time of trial, incompetent, which also prevented the Petitioner from entering an insanity defense. Additionally, the Petitioner contends the State committed acts of prosecutorial misconduct during the closing argument at trial. The post-conviction court held an evidentiary hearing, wherein it heard the following evidence:

The Petitioner testified that he had three co-defendants in the case but that he was tried by himself. Regarding the first issue presented in his post-conviction petition, the Petitioner testified that he asked his attorney ("Counsel") "three or four days before trial" to seek a settlement. He said, however, that Counsel never conveyed a plea bargain offer from the State to him. He told his Counsel that he wanted his defense to be that he was at the scene to purchase marijuana and knew nothing about a robbery. On the day of the trial, Counsel told the Petitioner that the best defense would be that his robbery was different from

4

his co-defendant's robbery. The Petitioner testified that he did not want to mention that he had anything to do with a robbery because he was charged with felony murder.

To the Petitioner's claim that Counsel introduced no physical evidence, the Petitioner testified that gloves, drugs, scales, and bags were found in the trash can across the street from the home where the crimes occurred. The Petitioner stated that Crockett admitted to Detective Kelton that the drugs belonged to him. When asked at trial, however, Crockett pled the fifth. The Petitioner claimed that his Counsel, during cross-examination, failed to mention evidence that the drugs found on the scene belonged to Crockett. The Petitioner further complained that Counsel was ineffective in questioning Crockett by not bringing up his criminal record. He asserted that Crockett had drug possession offenses on his record, which the Petitioner stated would have supported his defense that he was at the house to purchase drugs. The Petitioner complained that his Counsel did not ask Crockett about his previous convictions. Counsel only asked Crockett if the drugs found in the trash can across from the home belonged to him, to which Crockett pled the Fifth. The Petitioner stated that Counsel should have impeached Crockett's testimony, and Counsel should have shown Crockett's criminal records to the jury.

The Petitioner testified that his Counsel was ineffective for failing to subpoena certain witnesses to testify in his defense. Specifically, he argued that Counsel should have subpoenaed an anonymous neighbor who reported to the police that she saw someone run across the street from the location of the shooting and place something into the garbage can. The Petitioner stated that his Counsel could have hired a private investigator to locate the anonymous neighbor witness. He also stated that Counsel should have subpoenaed Detective Kelton to testify that Crockett admitted that the recovered drugs belonged to him. The Petitioner claimed that, through these witnesses, Counsel could have supported the defense that the Petitioner was at the home to purchase drugs and not to commit a robbery.

The Petitioner testified that his Counsel should have allowed him to testify in his own defense at trial. The Petitioner admitted, however, that he waived his right to testify. He stated that he would have told the jury that he was at the home to purchase marijuana. He said that he was told to wait in the livingroom. He testified that his "charge partner," who was also his cousin and co-defendant, entered the home because he knew Crockett and wanted to purchase "a little dime sack or maybe a 20 sack." The Petitioner said that, while he waited outside the residence, he heard gunshots. Then, his co-defendant limped around the corner of the house and said he had been shot. Due to his co-defendant's injuries, the Petitioner carried him to the car.

The Petitioner stated that Crockett testified that his co-defendant wore a mask during

5

the incident and that the Petitioner did not. The Petitioner testified that, had his Counsel emphasized that the Petitioner was not wearing a mask during his questioning of Crockett and during his closing argument to the jury, it would have shown that he was not there to rob the residence.

The Petitioner also complained that Counsel failed to assert to the jury in closing argument that Crockett and other witnesses may have fabricated their stories. He felt that the testimony of Mary Jane Crockett, Christopher Crockett's mother, was inconsistent. First, she testified that there was one volley of gunfire in the home and that there were no more gunshots in the house. Later, she testified that the Petitioner was three feet from her, within an arm's reach, and the Petitioner had the barrel of the gun pointed at Christopher Crockett's chest. Christopher Crockett testified that the Petitioner began firing his weapon immediately after gunfire erupted. The Petitioner opined that someone would have been hurt or killed if that had been true. Therefore, the Petitioner concluded that those witnesses fabricated their stories. He complained that Counsel failed to highlight those inconsistences to the jury during his closing argument.

The Petitioner contends that his Counsel was ineffective by not hiring a private psychologist or psychiatrist to evaluate the Petitioner's competency and ability to enter an insanity defense. The Petitioner was represented by a different trial counsel before Counsel and that trial counsel had the Petitioner evaluated in 2004. The Petitioner testified that he had been a patient at Middle Tennessee Mental Health Institute "[m]any, many times" from age nine through 2004. Up until the trial, the Petitioner had been taking a medication called Haldol Decanoate. Although state doctors, psychologists and psychiatrists found him competent to stand trial, the Petitioner thought that Counsel should have hired private doctors to evaluate him because he may "have possibly been found incompetent to stand trial."

The Petitioner asserted claims of prosecutorial misconduct. He argued that the prosecutor made improper statements during the closing argument, specifically that the prosecutor "preyed on the jury as parents of small children and/or as a victim of crime." The Petitioner contended that the prosecutor "invoked fear" in the jurors by asking them to imagine that someone came into their houses while their kids were inside. The Petitioner stated that his Counsel did not object to that argument. The Petitioner further argued that it was improper for the prosecutor to tell the jury, in the closing argument, that the Petitioner was guilty of the charges. The Petitioner's Counsel did not object to the statement during the closing. As a result of his arguments, the Petitioner asked the trial court to overturn his convictions and allow him a new trial.

Counsel testified that he had practiced law for twenty-nine years, and, of those years,

6

the last twenty were primarily in the area of criminal defense. Counsel had been appointed to represent the Petitioner. Two other attorneys had represented the Petitioner on the same charges before Counsel was appointed. Counsel stated that he did not recall if a formal plea agreement had been made and did not recall that the Petitioner showed interest in one. He recalled that he may have discussed a term of thirty-five years with the Petitioner, but the State never extended him a formal offer of thirty-five years. Counsel described his relationship with the Petitioner as "good." The Petitioner participated in the trial by talking to Counsel and giving suggestions during the trial. Counsel was aware that the Petitioner had been evaluated by doctors, who concluded that he was competent and sane. Counsel did not notice anything about the Petitioner that caused him concern or caused him to believe that these results were flawed. He testified that had he noticed anything of concern about the Petitioner's mental stability, he would have had him reevaluated.

Counsel testified that whether Crockett was a drug dealer was not an issue in the case because the State conceded that Crockett was a drug dealer. Other than the Petitioner's testimony at the post-conviction hearing, Counsel was not aware of any evidence that the Petitioner was at the home to purchase drugs and not to commit a robbery. The jury knew that there were drugs and possibly a weapon in the trash can across the street from the home. Counsel testified that the reason for the robbery of this particular home was, in part, because Crockett was a drug dealer. Counsel stated that he had heard that information had leaked out that Crockett had settled a lawsuit for some "cash money" or that cash was at the house as a result of the lawsuit.

Counsel testified that the Petitioner's identity was not an issue, in part because the Petitioner was close to seven feet tall. The witnesses identified the Petitioner in a photographic lineup and gave police officers descriptions of the Petitioner. Counsel stated that the trial proof did not support the theory that the Petitioner's purpose for being at the house was to purchase drugs instead of to commit a robbery. Counsel's theory was that the Petitioner did go to the house to "rip off," or rob, the occupants of the house and, unbeknownst to the Petitioner, another person, a co-defendant, came in the backdoor, got in a gunfight with "this kid who . . . was involved [in] drug dealing." Counsel testified that he argued that the co-defendant's actions were "separate and apart" from those of the Petitioner.

Counsel testified that the Petitioner had not complained to him about not testifying. Counsel stated that he advised the Petitioner not to testify, but the Petitioner also never told Counsel that he wanted to testify. Counsel stated the Petitioner's testimony would not have changed the facts.

Counsel testified that, contrary to the Petitioner's claims, he met with the Petitioner more than three or four times. He said that he met with the Petitioner several times, and

7

accepted several collect phone calls from the Petitioner, discussing the case over the phone as well as in person. Counsel felt adequately prepared for trial. He testified that the discovery in the case was "voluminous," and the State had an open file policy for discovery. Counsel stated that he knew what the testimony would be during trial.

After considering the evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner argues that the post-conviction court erred when it dismissed his petition for post-conviction relief because he received the ineffective assistance of counsel, and he further argues that the State made improper arguments during its closing, amounting to prosecutorial misconduct. The State argues that the trial court properly dismissed the petition.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

## A. Ineffective Assistance of Counsel

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth

Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the matter at hand, the post-conviction court examined the credibility and weight of the witnesses' testimony, considering the Petitioner's admitted involvement in illegal activities and his criminal record. As a result, the post-conviction court determined Counsel's testimony to be more credible. We find that the post-conviction court properly weighed and valued the witnesses' testimony, and we will not reevaluate that evidence. *See Momon*, 18 S.W.3d at 156 (Tenn. 1999); *Henley*, 960 S.W.2d at 578-79 (Tenn. 1997). Further, the record shows that Counsel met with the Petitioner on several occasions, consulted with the Petitioner regarding trial defenses, provided evidence at trial to support the Petitioner's defense, did not hide facts from the jury, properly handled the questioning of the State's witnesses, and sufficiently evaluated the Petitioner's mental status. Thus, we conclude that the Petitioner failed to show that Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Having failed to show the first prong of the Strickland standard, the Petitioner has not met his burden of showing that he is entitled to post-conviction relief based upon Counsel's performance. *Id.* He is not entitled to relief on this issue.

Additionally, several of the Petitioner's complaints focus on trial strategy and tactical decisions made by his Counsel, including the following: impeachment of Crockett, not producing Crockett's criminal records, emphasizing that the Petitioner wore no mask, and the content of Counsel's closing argument. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Counsel testified that he felt adequately prepared for trial, he had a voluminous discovery file, and prosecutors had an open file discovery policy in the case. As evident through Counsel's testimony, he knew the facts of his case, he understood the State's position, and he made tactical decisions based on that knowledge. Because it is well established that "[t]he fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation[,]" we do not find that Counsel was ineffective. *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). The Petitioner, therefore, is not entitled to relief on this issue.

### B. Prosecutorial Misconduct

The Petitioner alleges that the prosecutor committed misconduct in his closing argument at trial. No claim, however, of prosecutorial misconduct was raised on direct

appeal.  Therefore, this issue is waived.  *See* T.C.A. § 40-30-106(g) (2006) (providing that claims are waived if they could have been, but were not, presented in an earlier proceeding); *see also Tony A. Phipps v. State*, No. E2008-01784-CCA-R3-PC, 2010 WL 3947496, at *14 (Tenn. Crim. App., at Knoxville, Oct. 11, 2010), *no Tenn. R. App. P. 11 application filed* (holding that the petitioner waived the issue because no claim of prosecutorial misconduct was raised on direct appeal).

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief. The evidence does not preponderate against the post-conviction court's findings.  Counsel personally met with the Petitioner, in addition to accepting several collect phone calls and speaking with him over the telephone, and presented evidence at trial to support the defense that the Petitioner intended to rob Crockett independently of another robbery that took place at the same time.  In accordance with the foregoing reasoning and authorities, we affirm the judgment of post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

11